BREAUX, C. J.
Plaintiff complained of personal injury, caused by a collision between a freight train of the defendant company and a log train at the Iatt Lumber Company, on the evening of October 11, 1911, which resulted in the death of her late husband, Robert. Strickland, and for his death she claimed $30,000 damages.
The decedent, who was 46 years of age, was instantly killed in the accident.
Suit was instituted by Mrs. Strickland, as widow and for her minor heirs, against both the Louisiana Railway & Navigation Company and the Iatt Lumber Company, the owner of the log train.
The late Robert Strickland was employed as section 'foreman of the section crew of the Iatt Company. His duty was with his crew to keep the mill logging road in repair. On the evening of the casualty, he was returning on the log .train of the mill company to his home in Colfax.
Defendant asked for a severance of trial, which was granted, and a trial was proceeded with against the Louisiana Railway & Navigation Company.
The jury found a verdict for $20,000.
[1, 2, 4] The facts are that the collision occurred on the main line of the Louisiana Railway & Navigation Company, at or near the McNeeley switch.
The Iatt Lumber Company has its sawmill near the main line of the Louisiana Railway & Navigation Company. It hauls its logs from the woods to the sawmill on a tramway which connects with the main line of the Louisiana Railway & Navigation Company a short distance below the town of Colfax. The Iatt Company runs its tramway about a mile over the main line. That is from the point where the tramway connects with the main line to the sawmill.
■ It was agreed between the Louisiana Railway & Navigation Company and the Iatt Lumber Company, as a condition upon which the Iatt Company was permitted to use the main track of the former company, that the *241 latter should be governed by the rules and regulations of the Louisiana Railway & Navigation Company. The Iatt Company also bound itself to protect the Louisiana Railway & Navigation Company against all loss growing out of personal injury. The contract also provided that no one was to be allowed to ride on the log train except those operating the trains. That the logs must be securely chained and fastened.
The defendant urges that the location of its cars was under proper protection in accordance with the railroad regulations and in accordance with the welfare of the general public. Defendant’s further proposition is that the Iatt Company provided a hand car. for Strickland and crew to use, and that Strickland was riding on the pilot of the engine, and that he assumed the risk incident thereto. It is further alleged that the railroad company and the sawmill company had a contract under which the log train was operated, and the charge is that the sawmill company was violating that contract in certain stated particulars and was not observing the railroad rules in coming up the main track. Defendant also alleged that in the contract it was provided that a judgment against it should be entered against the Iatt Lumber Company.
Defendant under written agreement authorized the Iatt Company to use 3% miles of its main track and connect its tramway at a convenient point for the running of its Tog train to its sawmill, erected near defendant’s main line. The Iatt Company was to keep its logging cars in good, serviceable condition and satisfactory to the superin-1 tendent of the defendant company. As above mentioned, the operation of the trains of the Iatt Company was to be governed by the rules and regulations of the defendant railway company. The Iatt Company bound itself to protect the defendant company from all demands for personal injury. It was to ■ stand between the defendant and all claimants for damages growing out of any casualty.
The Iatt Company also bound itself not to carry passengers for revenue and to ship its products over defendant’s line, and in addition to pay $600 per annum to the defendant' company for the use of the track before mentioned.
Strickland was riding on the train of the Iatt Lumber Company, operated under a lease or agréement. A short while before the casualty, the logging train, which the decedent had boarded at some distance in the woods, arrived at the main track; as it has a right to do, it entered upon the track of the defendant company. Two cars of the defendant company had been left on this main track without light or flagman and without the knowledge of the crew on the logging train. The logging train ran up to these two cars with which it collided. This happened about half past 6 o’clock in the evening. It was quite dark. One of the effects of the collision was that four of the logs. corded on the logging train fell out. Strickland jumped out and in his attempt to escape was struck by one of the falling logs, which crushed him to death.
There was no reason in the excitement of the moment for the deceased not to seek safety by jumping off the logging car.
One of the defenses is that the deceased should not have returned from his work to his home on the logging train. That there was a hand car. The. manager of the sawmill, Mr. Lurry, testified that he had instructed Strickland and other employés not to ride on the log train as it was dangerous.
Another ground of defense is that there was no' reason for his returning as early in the afternoon.
The weight of the testimony does not sup *243 port the statement of the manager. We have made the following brief extracts:
“It was customary to go and come on the log train.” Statement of Lacroix, at one time president of the latt Company.
“It was usual for the crew to ride on the log train and that he himself rode on the log train.” McKnight, a surveyor in the employ of the latt Company at the date of the trial.
“Rode on the train every day.” Lacroix, brother of former president of the latt Company.
“It had always been usual to ride on the log train.” Leonard, at one time section foreman and still in the employ of the company.
“It was not unusual for the section crew to return on the log train.” Hilliard, engineer on the log train.
McCullom, the conductor, was on the log train at the time of the accident, and when this train was on its way in the afternoon he permitted Strickland and his crew to board the train.
This conductor was employed by the defendant company because deemed competent. He was paid by this company but the amount paid was refunded to it by the latt Company. Strictly speaking, this conductor was practically in the employé of the latt Company.
“The crew rode on the log train ; was riding on the train at the time of the accident.” Zabe Vauthan, brakeman. This is the statement of this witness.
Misha, as witness stated:
“At the time riding on the train.”
As against all of these witnesses, Mr. Lurry, the manager, testified, ‘as just above stated, that he had instructed “Strickland not to ride on the log train.”
The instructions evidently were not insisted upon. They were not followed. The manager saw the cars in the morning and in the evening and was never heard to object to the section crew and others riding on this log train. There was a seat provided for them and steps to- go up to it on the pilot, which was an invitation to the crew and others who had to go to their work-to step up and sit down on this convenient seat.
According to the testimony of Dr. Grey, the physician at Colfax, Strickland was killed about midway between McNeeley spur and the spur to -the latt mill.
According to part of the evidence, the place where Strickland was killed was not within the yard limits.
There were witnesses who testified that the log train was entirely at fault. That the latt Company in consequence was exclusively responsible for the injury. They-mention that some one should have been sent ahead to precede the log train after it entered upon the main track of the defendant company; that the train crew was entirely wanting in sufficient caution.
If this were the only testimony upon the subject, it would fix absolutely the responsibility upon the logging train. But, after reading this testimony, it seems evident that one or the other, or perhaps both, of these companies were at fault. Just before closing the taking of testimony, witnesses were called by the latt Company, and their testimony was different from that of the defendant’s witnesses who sought to fix the responsibility upon the logging train. These latter witnesses stated emphatically that just before entering upon the main track they had given the required signal; blew the whistle twice, and that they were quite careful; that there was no light but darkness in front; that their only light was a headlight in front of their train, which did not throw light sufficiently forward to enable them to prevent the collision. When they saw the car with which their train collided there was no possibility of preventing the collision.
The thought occurs that, the log train having given the signals, there should have been sufficient activity among the train people of the defendant company to see that there was another train on the track which, if not warned, would in the darkness collide with the two cars that had been left on the main *245 line. As we construe the issues, there was some duty devolving upon the defendant as well as duty devolving upon the log train.
Defendant urged in its defense that Strickland was killed within the limits of the railroad yard. We have already stated that the evidence is not convincing upon that point. There is good reason for thinking that the accident did not occur in the railroad yard. But, be that as it may, the defendant, even if it was its yard, owed ordinary duty to any one found therein. Even the trespasser is entitled to some little consideration. We must say that we are not convinced, however, that it was within the railroad yard. The plat in evidence does not, to our thinking, show that the yards were as extensive as claimed. Furthermore, it must be considered that the deceased was not an entire stranger to the work of the defendant, and therefore entitled to more protection than accorded to the trespasser. We have noted that he was a section foreman; he saw to the repairs of over three miles of defendant’s main line.
Evidently the defendant found it to its interest to grant to the Iatt Company the right of way over its line. In addition to the small amount that the lumber company paid for this privilege, it bound itself to haul all of its lumber over defendant’s road. The mill was large; its daily capacity is 150,000 feet of sawed lumber. The defendant and the Iatt Company were using the same track for a short distance, it is true, but for their mutual benefit, and to some extent at least the defendant had reserved some authority over the Iatt Company’s train, and the employés who rode on the train were not strangers nor trespassers.
But it is said that the defendant company provided a hand car for these employés. Their answer for not using the hand car on the day in question was that it was not at their place of work in the woods at the time they left to return to their homes.
[3] Again it was stated in argument that Strickland left his work before time. The testimony of the bookkeeper shows that he stayed full time on the day that he was killed. It follows, then, according to this statement that the crew and the crew foreman, Strickland, did not leave before the time. But, even if they had, it would afford scant ground for complaint on the part of defendant. There may have been reason for leaving the work earlier than usual.
Defendant cited in argument the Case of Johnson, reported in 129 La. 334, 56 South. 301, 36 L. R. A. (N. S.) 887. In this cited case the young man killed was not an employs of the road or of any one connected with the road. He was a stranger. The defendant road in that case was not guilty of negligence and committed no act which rendered it liable. Moreover, in that case one road did not find it necessary as a defense to urge that the other road was liable and had committed the acts charged by the plaintiff.
[5] A jury rendered a unanimous verdict in this case, which is entitled to respect and should be affirmed unless it is evident that the verdict is erroneous. Jurisprudence has given some importance to verdicts of juries. A number of decisions have been rendered, beginning with the case reported in Riddle v. Kreinbiehl, 12 La. Ann. 297; Ingram v. Louisiana & N. W. R. Co., 128 La. 933, 55 South. 580.
[6] As to the amount of the verdict: We have every reason to think that the deceased did not suffer. Death was instantaneous. He was 46 years of age, and the probabilities of his remaining years were about 22. 1-Ie earned from $1.50 to $2 per day, an average of between $55 and $60 per month.
We therefore assess the damages at $12,000.
For reasons stated, it is ordered, adjudged, and decreed that the judgment appealed from is amended by reducing the amount to *247 ?12,000, with 5 per cent, interest thereon from the date of the judgment in the district court, and as amended the' judgment and verdict are affirmed.
PEOVOSTY, X, dissents.