(72 South. 732)

No. 20672.

PORTER v. ROGERS OIL & GAS CO.

(June 30, 1916. Rehearing Denied Oct. 16, 1916.)

*(Syllabus by the Court.)*

MASTER AND SERVANT ☞205(1)—INJURIES TO SERVANT—RELIANCE ON CARE OF MASTER.

Where an employer assigns a common laborer to a particular work, at a particular place, and with appliances furnished by him, he is bound to foresee the possibility of an accident which may result from the character of the work and of the appliances so furnished, and the employé has the right to engage in the work with the assurance that the employer will so do, and will protect him, accordingly, against dangers which are not obvious and of which he is not sufficiently warned, either by his employer or by his own experience.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 547; Dec. Dig. ☞205(1).]

Appeal from First Judicial District Court, Parish of Caddo; John R. Land, Judge.

Action by Mrs. Bernice Porter against the Rogers Oil & Gas Company. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

John H. Mathews, of Winnfield, for appellant. Alexander & Wilkinson, of Shreveport, for appellee.

Statement of the Case.

MONROE, C. J. Plaintiff, widow of J. Baxter Porter, Jr., sues, upon her own account and on behalf of a minor child, to recover damages, alleged to have been sustained by them in the loss of the husband and father, whose death is attributed to the negligence of the defendant in failing to provide him with a safe place and appliances in and with which to discharge the duty to which he

was assigned, and to give him sufficient warning of the danger to which he was exposed. The case was tried without a jury, and plaintiff appeals from a judgment rejecting her demands. The story of the accident as told by the witnesses, is as follows:

Defendant had had an oil well, drilled by machinery to a depth of about 2,000 feet, and concluded to have it drilled deeper by hand. In order to turn the 2,000 foot of pipe and the bit upon the lower end, three pairs of tongs, with long handles, to serve as levers, were attached to that portion of it which extended above the surface of the ground, and Lewis, a stockholder in the company, and foreman of the job, and Lowe, a laborer, took one pair, Hart and Porter, laborers, another pair, and Loper, "gang pusher," the third pair. Having attached the tongs to the pipe, the men applied their strength and weight to the handles, and, moving around and around, turned the pipe to the right so that it operated as an augur and the bit ate its way down. It can readily be understood that force, thus applied at one end of a pipe so situated, does not instantly overcome the inertia and friction affecting the entire 2,000 feet, and that, by the time it reaches the bit, the pipe is twisted somewhat as the twisting of a rope, beginning at one end, extends gradually to the other. It appears also that, as the bit encounters tough, or soft, material, respectively, the resistance offered by the handles of the tongs to the efforts of the pushers becomes greater or less, and the grip of the jaws of the tongs upon the pipe becomes hard and fast, or relaxed, as the case may be, and, where the change is sudden, may be released entirely, in which event the tongs drop down, and particularly if their jaws are allowed to become loose or the serrations, or teeth, are worn off. And it further appears that in such case, that is to say, where the pipe is twisted and the force that holds it in that position is released, it will untwist with a violence proportioned to the extent of the twisting, and, in so doing, will carry around with it any tongs which may still hold their grip, or which, not having actually dropped, may catch a new hold, in the reverse movement of the pipe.

In this instance, the three pairs of tongs which were in use had been each provided with two men to operate them during the morning of the day of the accident, but later in the day one of the men was taken off, leaving one pair with but one man to handle them, from which it follows that, when the tongs manned by Lewis and Lowe lost their grip on the pipe, as is shown to have been the case, the strain upon the others was increased by two-fifths, and, as the original crew consisted of six men, it is fair to presume that the three who were left would not have been expected to support that strain. It is not clear, however, whether one pair of tongs lost their grip and then another, in succession, or whether there were two pairs that dropped from the pipe at the same time; the thing happened suddenly, and was over in an instant, and, about all that was known was that something slipped, the pipe revolved in a reverse direction, with great speed, carrying one pair of tongs with it, and the five men who were on the job, either fell or were knocked in as many directions; some falling in the direction in which they were pushing, and by falling escaping the flying tongs that were attached to the pipe and which passed over, or did not reach them, and others, including the decedent, being struck by the tongs and knocked, Lowe into the beltroom, and in other directions. Mr. Lewis says that he fell down, and that he was bruised upon his breast by the tongs against which he was pushing. Being asked whether his falling was a voluntary act, he replied, "Well, I would say not," from which it appears to us that, as his bruise was caused by the sudden reversal of the move-

ment of the handles against which he was pushing, it would be difficult to distinguish it from the case of a person who is knocked down. His workmate, Lowe, who was pushing against the same handles, called to the stand by defendant, testified as follows on his cross-examination:

"Q. At the time he (decedent) was hurt, what happened to you? A. When the tongs gave way and came back, they hit me. Q. Hit you? A. Yes, sir. Q. Hurt you? A. Not much; I didn't stop work. Q. Where were you hit? A. Right across the hip; on the hip socket. Q. How far did it knock you? A. I don't know, 4 or 5 feet; four or five steps, I reckon. Q. Why didn't you get out of the way before it hit you? A. I couldn't tell you; I didn't get out of the way; that is all I know. Q. The tongs flying around there were liable to kill you, if they hit you right? A. Yes, sir; might have. Q. Why didn't you get out of the way? A. I don't know about that—done so quick—I don't suppose I could."

Loper, defendant's "gang pusher," as he calls himself, gave the following testimony:

Direct examination by defendant's counsel: "Q. Did you have plenty of time to get out of the way? A. I did not have any time to spare." By the Court: "* * * I did not have any time to see what happened; I just had time to move. Q. You just had time to move? A. Yes, sir. * * * Q. And it was the front pair of tongs that gave way? A. No, sir; they all gave way at the same time, * * * but before they struck the floor, the rebound of the pipe caught one pair of the tongs. Q. That was the pair that struck? A. Yes, sir. Q. Now that pair knocked Porter down? A. Yes, sir." By plaintiff's counsel: "Q. Now there was one pair of tongs that stuck to the tubing, and that is the pair that hit him? A. Yes, sir. * * * Q. Well, if the tongs slipped—some of them gave way—one of them is liable to hang on the tubing at any time? A. Yes, sir. Q. Now that is liable to happen? A. Yes, sir. Q. Now, what provision do you make, if any, to guard against a thing like that? A. Nothing, only every one is instructed to watch for it and get out of the way. Q. Did he have much time to get out of the way? A. Well, he didn't need much time. * * * Q. Now, you just stepped outside of your tongs? A. Well, I just fell in that direction—I never did fall down—the step was all that we needed. Q. To throw yourself out of the way? A. Yes, sir; that was all we had to do when it cut loose. Q. Now, when it slipped in the morning, did you fall that way? A. Well, I never did fall down. * * * Q. Well, what did you do when it slipped in the morning? A. I got out of the way. Q. Did you examine the tongs afterwards? A. I didn't make a thorough

examination. I didn't examine them after I went back; but I went back about two days later and culled seven out. * * *"

By the Court: "Q. You instructed Porter how to avoid this danger? A. No, sir; I didn't tell him how to get out of the way; it happened so many times that he knew; he had gotten out of the way several times."

By Mr. Mathews: "Q. Those tongs had fallen down before? A. Yes; every once in awhile, the tongs will catch, maybe a half a dozen times they won't catch, and then maybe they'll catch once. Q. Now, did you ever drill any more by hand since then? A. No, sir."

Hart, the only remaining member of the crew that was engaged in the drilling, and who was working with the decedent, on the same tongs, testifies, in part, as follows:

By Mr. Mathews, plaintiff's counsel: "Q. Now what happened there, just at the time Mr. Porter was hurt? A. Well, it happened so quick that the most I knew about it was what I saw after I picked myself up in the yard. I know that something slipped, and the next thing I knew I was picking myself up, and Mike Lowe was near the belthouse, and Porter was leaning up against the ladder. Q. What became of you? A. I fell on my hands on the edge of the floor, and then into the yard. Q. What threw you there? A. The tongs that I had; I had them against my breast, * * * and when it gave way, it threw me out of the way; that was when it came back. * * * Q. Well, you say it happened so quick you couldn't tell exactly what was the matter? A. No, sir; I couldn't tell what was the cause of it. Q. Well, what would cause the tongs to fly around backward? A. Well, defective tongs would be one cause; that is, one pair of them. * * * Q. Now, after you were thrown out, did you have occasion to look at the tongs you were working with? A. Yes, sir; I examined the three pair that very day. Q. Just after the accident, where did you find the tongs? A. Well, one pair was fastened to the pipe, that is, the new pair, and one pair was laying in the yard on one side of the rake, and the other was laying on the floor, on the opposite side of the tubing where we were working. * * * I examined the three pair myself to see what caused the accident. * * * I found * * * that the tongs that were on the tubing were in good condition, and the others were in bad condition; the pair that were in the yard—the jaws were loose, that is, these jaws here were spread open (witness showing jaws of tongs), and these ridges here were nearly worn off, almost slick, and the other pair, that were on the floor, were worn a good deal. These were worn almost completely off; that is, these ridges."

Gus Botts, called by plaintiff, was production foreman for the Standard Oil Company,

at Oil City; had had 14 years' experience; was asked whether the hand drilling of a well at a depth of 2,000 feet was customary, to which he replied:

"No, sir; it is not; you ought to drill it with a rotary, or a jerk line on the tongs. * * * Yes, sir; it is dangerous drilling by hand. * * * Well, because if anything happens, or breaks off, with the strain on the pipe, and they have the tongs in there, and one set of tongs would break, you could not hold it, and of course the tongs would come back; there is where the danger would be. * * * Q. Now, suppose that some one did not see the tongs slip, or something did give loose, and was holding all the strain that he could, and it came back, what would you say about his chance of getting away? A. No chance at all; you have no time to think; it happens right now."

Mr. C. W. Brown, a contractor who has drilled a great many wells, and who was called as a witness for defendant, testified that he had known wells to be drilled deeper by hand in a good many cases, and that he had done it himself; that there is no extra hazard about it. He was asked what drillers he knew of who drilled by hand at that depth, meaning 2,000 feet, and he mentioned one company that "drilled a deep well that way," and said, "We drilled one for the Rogers Company, and they finished it and then went back and drilled deeper." He testified that Porter had worked for him, and was aware of the danger of drilling by hand. And he was asked by the court, "You are satisfied that he assisted you in drilling a well by hand before this time?" to which he replied, "Yes, sir." He was then examined by defendant's counsel as follows:

"Q. Well, what well was that? A. That was Rogers No. 5. Q. How deep did you drill that well by hand? A. I think it was about 1,100 feet. Q. Drilled by hand? A. No, sir. Q. About how many days do you think he worked, helped drilling by hand? A. I don't remember the number of days, now; but it was several days though, two, three, or four days, something like that. Q. Now, the usual thing is to drill by machinery at that depth? A. Yes, sir. Q. That is the usual method? A. Yes, sir; a good many wells are drilled to where they think they are deep enough, and then some are drilled a few feet deeper."

B. F. Rogers, defendant's president, testified as follows:

"Q. Had you ever worked on any wells like this one? A. Yes, drilled two wells that way. Q. What did you drill them that way for? A. Well, when we completed the wells, the rotary was moved, and it is not producing enough, and it looks like it is not deep enough, you can go on and drill a few feet deeper without much expense or much risk; don't cost anything to drill a few feet deeper. * * * Q. Outside of your company, what other companies use that method of drilling by hand? A. I do not know of any one outside of my own; very seldom off of my own property."

Mr. Lewis testified as follows concerning the tongs:

"Q. Did any one inspect those tongs before the accident—who was the foreman? A. Mr. Loper was the foreman. (Elsewhere he says that *he* was the foreman, and a stockholder, and Loper testifies that *he* was a 'gang pusher.') Q. When were they inspected, before the accident? A. I don't know, now, but they had been in use at the well; we had no man to inspect them that I know of. Q. Who repairs the tongs and keeps them in repair? A. Well, that is the foreman's duty; they are hard steel, and they have to send them to the shop when it is necessary."

Cross-examination: "Q. How long had those tongs been in use? A. Two pair, I think, were brand new, and I don't know about the other pair, but they were practically new; they had not been in use but a short while."

Mr. Loper gave the following testimony on the same subject:

Direct examination: "Q. Now do you examine those tongs to see whether there is anything the matter with them? A. Well, as a matter of fact, we had to examine them every time we put them on the pipe; we always see that the tongs are in good shape. Q. Did you examine them the day before you put them on? A. Yes, sir; every time they fell. * * * Q. What was the condition of the tongs? A. Two pairs of the tongs were brand new, and one pair was as good tongs as that pair that is here in court. Q. How old were they? A. I don't know how old they were; that is, the oldest pair of tongs, but they were in good condition, as good as the new tongs. * * * *"

Cross-examination: "Q. You say you examined these tongs every time you put them on? A. Yes, sir; every time I slipped and fell, I put them on. Q. You say that two pairs of the tongs were brand new, and the other pair were not so new? A. No, sir; it was not as new as they were, but they were in good condition. Q. Well, how long had that pair of tongs been in use? A. Since I have been on the job. Q. How long has that been? A. Nearly three years. Q.

How often has it been repaired? A. It has never been repaired."

Porter was struck on the left side, and had three ribs broken, and he died, after constant suffering, on the Wednesday following the Sunday upon which the accident occurred. The physician, who was first called, and who visited him several times, testified that he did not, at first, think that the injury would result in death, but he knew of no other cause that could have produced death, "not directly." Being asked what else there was to cause death, he said:

"Well, if his system was charged with malaria, the shock or the blow might have caused what is known as 'uric poison,' and his kidneys might not have acted properly; and, if he had been full of malaria, it would have had a bad effect upon his kidneys, more so than if he were healthy. Q. You did not hold any autopsy? A. No, sir; I didn't see him after he died. Q. Then you do not know of any reason for his death except these wounds? A. No, sir."

On redirect examination: "Q. Doctor, a man that was up and was able to work (on Sunday) and nothing the matter with him except malaria, you would hardly think he would die by Wednesday? A. No, sir; not unless it was a malignant case. Of course, sometimes they die in less time than that. Q. You did not discover in this patient a malignant case? A. No, sir."

Another physician, summoned by defendant, testified that he called to see Porter on the day that he died, about an hour before his death; that he found him bandaged up, and did not remove the bandages, but went over him thoroughly without doing so. Being examined by defendant's counsel, he testified that Porter had the appearance of a man in a toxic condition—what is called a case of "chronic malaria"—that he authorized a certificate to be signed, showing that he died of noncontagious disease; that he did not know "point-blank" what he died of; could not say that the lick killed him; could say that it possibly contributed to his death; did not think that it created the toxic condition, though it might have done so, and might have caused the kidneys to become involved. His attention being called to the

fact that the death certificate showed the cause of death to be "accidental injury," he stated that he had telephoned to Mr. Lewis, authorizing him to put on the certificate, "Died of noncontagious disease," and that the certificate was not signed by him. Being asked by the court whether Porter showed any symptoms of swamp fever, the witness replied:

"Well, he was yellow; that is what we see in swamp fever. As far as the kidneys were concerned, I did not see, or examine, his urine. His bowels were acting; acted two or three times while I was there. I saw some blood with the bowel movement, but, in getting the history, was told he had taken a purgative, and they said it acted very drastically, and caused several bowel movements, and that is where I thought the blood came from."

### Opinion.

Our conclusion, from what appears in the preceding statement, is that it was through no fault or negligence of his own that Porter received the injury that resulted in his death and deprived the plaintiff of her husband.

There is not a scintilla of a suggestion anywhere in the record, worthy of a moment's consideration, that he did anything that he should not have done, or left undone anything that he should have done, for the protection of his life, after he had undertaken the duty to which he was assigned by defendant, and yet he is dead as a consequence of that undertaking. In qualifying the statements so made by the expression, "worthy of a moment's consideration," we refer to the statements in the testimony of Lewis and Loper, to the effect that the decedent, after he had received the injury, said—

"that he stood there like a damned fool, in the way, and hollered at us (meaning the other men) to get out of the way."

Stood where? When the accident happened, the men were engaged in pushing the tongs around, as so many handles to the

2,000 foot augur with which they were boring into the ground, and when the two pairs lost their grip on the pipe, the reverse movement of the pipe was instantaneous and brought the remaining pair whirling back and around the circle, sweeping everything before it. There is not a witness who pretends that he had time to think of anything until he realized that he was picking himself up from the place to which he had fallen, or had been violently knocked. How, then, could Porter, when the others had no time to think at all, have found the time, during the inappreciable interval between the beginning and the end of accident, to stand "there" and "holler" at the others to get out of the way? And if he had found the time, which did not exist, and, in disregard of the law of self-preservation, had utilized it by standing and hollering to men whom he had known but a few days, why is it that none of them pretend to have heard him holler, and yet, he being dead, that two of them attribute to him a statement which every fact established and every other word of testimony that has been given show could not have been true? That, suffering from the blow of which he was shortly to die, he said something which the witnesses misunderstood is possible; that he could not, intelligently and truthfully, have said what they say he did is certain. We repeat, then, that Porter came to his death, through no shadow of fault on his part, by reason of what happened to him while he was engaged in the work and at the place to which he was assigned by the defendant and while he was using the appliances which were furnished by defendant for the purposes of that work.

Let it be conceded that, though he was not at fault in the matter, it does not follow, as a necessary deduction, that his death was brought about through the fault of the defendant.

The question immediately suggests itself, however, can an employer be said to be without blame for the death of an employé who loses his life while doing the work for which he was employed, according to the instructions given and with the appliances furnished him by such employer? Defendant's learned counsel consider that they have found an answer to that question in the rulings of this court, to the effect that:

"Where an employé is not placed by his employer in a position of undisclosed danger, but is a mature man, doing the ordinary work which he was engaged to do, and whose risks are obvious to any one, he assumes the risks of the employment, and no negligence can be imputed to the employer for an accident to him therefrom."

The quotation is excerpted from the syllabus in the case of Moffet v. Koch, 106 La. 372, 31 South. 40, in which case it appeared that the plaintiff was a carpenter and house framer who had worked at that trade for 20 years; that he acted, during a great part of the time, as foreman of the job upon which he was engaged when injured; that he assisted in raising into position the trusses that were to support the roof of the building that they were framing; that he was acting as foreman at the moment of the accident, and was engaged in spreading the purlines across the trusses, and for that purpose had gone upon one of the trusses, which he himself had assisted in putting in position and which was insecurely balanced, without support, save that one end rested upon one wall and the other upon the other wall, and that the truss lost its balance and fell; that he had been warned that the position of the truss was insecure, and should have known it without warning, since that was his business; and that he had at his command a derrick, with guy lines, with which he could readily have made it secure. It was said by the court:

"But we learn from the record that the plaintiff was regarded as a competent man for his position, i. e., the position of foreman of the job, and there was no reason to suppose that he

would be unable to do work which properly belonged to that position, and the risks of which he had assumed [in accepting] and in holding such position."

Counsel cite the case of Taylor v. Rock Island, etc., 121 La. 543, 46 South. 621, in which the plaintiff was a brakeman who had been engaged in that occupation for 3 or 4 years, and was familiar with its ordinary risks. As the train upon which he was employed was about to stop, he was ordered to cut off the engine, and was slightly injured in the execution of that order. The court said (among other things):

"We are satisfied that he went between the tank and the car before the train had settled to a condition of rest, and that the movement [whereby he was injured] was merely the adjustment, or taking up of the slack, which is a common and necessary incident to the stopping of all trains, and one with which plaintiff was perfectly familiar. We are also satisfied that the order given to plaintiff did not contemplate that he should undertake to cut off the engine until the train had ceased to move, and that plaintiff so understood."

Another cited case is that of Travis v. Kansas City S. R. Co., 121 La. 885, 46 South. 909, in which the plaintiff was the widow of a brakeman, and alleged that her husband had lost his life by reason of the negligence of the defendant in failing to furnish the necessary lights in its yard. It was held that the deceased was an experienced switchman, who must have known the situation and therefore assumed the risk.

The persons who were injured in the cases thus cited were so injured whilst in the discharge of the ordinary functions of ordinary businesses, conducted in the ordinary manner. They were familiar with the risks incidental to those functions, which were not unusual or extraordinary, and were injured because, though familiar with them, they failed to take account of them.

In the instant case, an effort was made to show that the deepening of a well, already 2,000 feet deep, by hand drilling, is a custom-ary thing, and is not extrahazardous, and the counsel say, in their brief:

"Mr. C. W. Brown, an experienced driller, and a man who stands high in the community, testified that the method employed was the usual one for drilling a well deeper."

Mr. Brown gave the following testimony on that subject:

On direct examination, by defendant's counsel: "Q. I will ask you if it is anything unusual to drill a well deeper by hand, such as the witness has just described here? A. Well, I have known it to be done in a good many cases. Q. Have you done it yourself? A. Yes, sir. Q. Is there any extra hazard about that method? A. No, sir. * * * Q. Now is that as safe as drilling it deeper would seem? A. I wouldn't consider it as dangerous that way as the other way. Q. Well, why? A. Well there are not as many things to get hurt with. Q. Is it an unusual thing to drill a well, when you want to only drill it 25 or 30 feet deeper, to do it by hand? A. No, sir; it is done in a good many cases."

In his cross-examination, he was able to mention one company that he had heard of that had drilled a deep well by hand, and he said:

"And we drilled one for the Rogers Company and they finished it, and then went back and drilled it deeper."

He then gave some testimony in regard to Porter, and his cross-examination proceeded:

"Q. Well, what well? A. That was the Rogers No. 5. Q. How deep did you drill that well by hand? A. I think it was about 1,100 feet. Q. *Drilled by hand?* A. *No, sir.* * * * Q. *Now the usual method is to drill by machinery, at that depth?* A. Yes, sir. Q. That is the usual method? A. Yes, sir; a good many wells are drilled to where they think they are deep enough, and then some are drilled a few feet deeper."

Mr. Botts, as appears in the statement of the case, testifies that the deepening by hand of a well already 2,000 feet deep is not the usual and customary method; that "you ought to use a rotary or a jerk line on the tongs," and he describes the dangers of drilling by hand, at that depth, which have been, further, so graphically described by the other witnesses, and so lamentably il-

lustrated by the death of the plaintiff's husband. He further testifies as follows:

"Q. Now, turning tubing 2,000 feet, is it not a fact that the top part of it has to go several revolutions before the bottom goes at all? A. Yes, sir. Q. Is not that what is called the strain on the pipe? A. Yes, sir. Q. What is the effect when the power is turned up and released; that is, when it is turned and will not turn forward, now what does the pipe do, in case some of the tongs are released, or some of the power is released? A. Well, it will turn back until it gets the strain out of it. Q. With much force? A. Well, it is according to how much strain is on it; of course, the less the strain, it will come back with less force. Q. The greater force that is put against it going forward, it would come back with that same force? A. Yes, sir. Q. What have you to say about five men undertaking to drill a well, where it is 2,000 feet deep, and drilling it in shale? A. We would use steam."

Mr. Rogers, the president of the defendant company, as we have noted, never heard of any company, save his own, deepening a deep well by hand, and he pursued that method, in this instance and on two other occasions, because:

"The rotary was moved, and it is not producing enough, and it looks like it is not deep enough, you can go in and drill a few feet deeper, without much expense or much risk; don't cost anything to drill a few feet deeper."

In the view of the demonstration which this case affords that, in drilling by hand, the tongs are likely to, and do, frequently lose their grip on the pipe, that, when they do so, with the tension of a twist of 2,000 feet, the pipe will instantly and violently reverse its movement, and that, in such case, those who are handling the tongs have no chance whatever to get out of the way, we can only say in regard to the testimony of Mr. Brown, to the effect that hand drilling is not extrahazardous, that he, perhaps, so testified because his experience in that kind of drilling had not extended to very deep wells. His testimony, when called on to be specific, developed absolutely nothing in regard to the deepening by hand of a 2,000-foot well, save as appears in the last two questions and answers on his cross-examination to wit:

"Q. Now, the usual method is to drill by machinery at that depth? A. Yes, sir. Q. That is the usual method? A. Yes, sir; a good many wells are drilled to where they think they are deep enough, and then some are drilled a few feet deeper by hand."

If, however, it be true, as Mr. Rogers says, that it costs nothing to dig a well a few feet deeper by hand, no matter how deep it may be already, why should not that method be universal? The answer would appear to be that other operators had learned what Mr. Rogers found out only when Porter was killed, to wit, that, though, perhaps, not so denounced by statute, it is, from a moral point of view, a criminal trifling with human life, in which, apart from the moral and humane aspect, the risk of loss by actions in damages is not compensated by the saving in expense.

It is said that plaintiff's allegation that the tongs which were in use upon the occasion of the accident were defective is supported by the testimony of the witness Hart alone, and that his testimony is contradicted by that of Lewis, Loper, Rogers, and Lowe, and that Lewis testified that the tongs were still in use. That view of the matter requires an analysis, and, we regret to say, some criticism of the testimony thus referred to. We do not hold, or believe, that witnesses may not testify truthfully when their interests are involved, but we are obliged to concede that all courts have, at all times, recognized the probability that testimony will be influenced, whether consciously or unconsciously, by personal interest.

There is no suggestion that Hart had any personal interest in this case. He was in defendant's employ when the accident occurred, but was not so when called as a witness, and his testimony, from beginning to end, impresses us as that of a man whose purpose was to tell the truth, without reservation, to the best of his knowledge and be-

lief. He was pushing on the tongs with Porter, and, according to his testimony, the next thing that he knew he was picking himself up in the yard, where he had been thrown or knocked by the whirling tongs. Having picked himself up, he went, first, to the assistance of Mike Lowe, who was lying near the "belt house," and who he thought had been killed. Finding that he was not needed by Lowe, he turned his attention to Porter, and, after a little, attempted to carry him to his place of residence, in a buggy, but, observing, as they were going along, that Porter was about to faint, he helped him out of the buggy and into a wagon, in which he was carried to his destination. He then came back and made it his business, at once, to examine the tongs, in order to discover whether the accident could be attributed to them, and he found one pair, the pair that were still attached to the tube, in good condition, and the other two pair in bad condition, but one pair in much worse condition than the other; the teeth having been worn off. He further testified that he did not hear Porter make the statement attributed to him by Lewis and Loper; and, being asked what Porter did say at that time, the question was objected to, and the testimony was excluded, a ruling which was clearly erroneous. Lewis, Loper, and Lowe testified, specifically, that they made no examinations of the tongs after the accident, and, further, as follows:

Lewis, that he did not know that the tongs had been inspected; that they had no man to inspect them that he knew of. Asked how long they had been in use, he answered:

"Two pair, I think, were brand new, and I don't know about the other pair, but they were practically new; they had not been in use but a short while."

Loper's testimony on that subject reads:

"Q. You say that two pair of the tongs were brand new and the other pair not so new? A. No, sir; they were not so new as they were, but they were in good condition. Q. Well, how long had that pair of tongs been in use? A. Since I have been on the job. Q. How long has that been? A. Nearly 3 years. Q. How often has it been repaired? A. It has never been repaired."

We infer from his testimony that the tongs were on the job when he came on it, so that, for aught that appears, they might have been in use for years before he was employed. Being further examined, he said (in answer to the question, "Did you examine the tongs afterwards"?):

"I didn't make a thorough examination. I didn't examine them after I went back, but I went back about two days later *and culled seven out.*"

It thus appears, according to the testimony of Loper, who was immediately in charge of the tongs, that Lewis' statement to the effect that the particular pair in question were "practically new," and had "been in use but a short time," was entirely erroneous, and was not justified by any information in his possession, and the same thing may be said about other testimony given by him concerning the condition and use of the tongs. Both Rogers and Loper testified that the teeth of the particular pair in question could not have been worn off, because, if they had been, they would not have held on to the pipe; but the fact is, *they did not hold on to the pipe,* while the teeth of the new tongs did hold on, and their failure to hold on is assigned by plaintiff as a probable cause of the accident.

Considering Loper's statement that, within about two days after the accident, he *culled out seven pairs tongs,* in connection with the fact that it is not pretended that any of the tongs that were in use on the day of the accident were produced at the trial, or otherwise accounted for, it appears not unlikely that the pair, admitted to have been more than three years old, were included in the culls.

Lowe showed an evident desire to make his testimony as favorable as possible to the

defendants. Being asked why he did not get out of the way, he answered that he did not know. Upon further cross-examination he admitted, reluctantly, that it was done so quick that he did not suppose he could. Being asked how far he was knocked, he answered, "About 4 or 5 feet, I suppose," but, as he was knocked into the belt room, and as the derrick floor, or platform, upon which they were working, is said to have been about 20 feet square, and the belt room, as we take it, was off the platform, he was obliged to admit that he was knocked 4 or 5 *steps*, instead of feet. He says that he examined "the tongs," but he does not say when, or whether he examined all of them or only one pair.

The only testimony given by Mr. Rogers concerning the tongs reads as follows:

After stating that it "don't cost anything to drill a well a few feet deeper," his examination continued:

"Q. What do you mean by a few feet? A. Three to 15 or 20 feet. Q. Had you drilled your wells that way before? A. Two. Q. You worked on them yourself? A. Yes, sir. Q. With these same tongs? A. No, sir; *I could not say these tongs.* * * * Q. If the teeth of these tongs had been worn, could they have been used? A. I do not see how they could. Q. Why? A. Would slip; would not hold."

We find, then, that, of the four witnesses upon whose testimony defendant relies, as showing that the tongs were in good condition on the day of the accident, Mr. Rogers, defendant's president, could say no more than that he did not see how the tongs could hold, without teeth; but, as the tongs did *not* hold, his testimony may amount to an explanation of their failure to do so, but does not tend to show that they had teeth. Mr. Lewis, one of the defendant's stockholders, and the man in authority at the time of the accident, gives testimony which satisfies us that he knew no more about the condition of the tongs than he did about the age of the particular pair which are shown

to have been more than three years old, and never to have been repaired.

Mr. Loper was defendant's foreman, according to Mr. Lewis, or "gang pusher" by his own account, and was expected to look after the tongs, and he would have the court believe, and so testified, that the tongs which had been in use since he came on the job, about three years before—and he did not say, and, probably, did not know, how much longer—and had never been repaired, were in about as good condition as those which were brand new. He saw and handled the tongs when they slipped and had to be readjusted, and he construes those occasions to have been examinations. We do not think they were. Lowe was a laborer in the employ of defendant, and evidently a willing witness, whose testimony on the subject of the tongs is indefinite and amounts to nothing.

Hart is the only witness who pretends to have made any examination at, or about, the time of the accident, with the view of really determining whether the accident could be accounted for by the condition of the tongs, and his testimony is corroborated, rather than contradicted, by the admission that one pair of them had been in use for three years, or more, without repair.

Another question is whether Porter was given any such warning, or had any such experience, of the danger of the work in which he was employed as would have placed him in a position intelligently to determine the character of the risk and to decide whether or not he would assume it. There is no evidence that any particular warning was given, nor do we think it has been shown that he had had any other experience in the hand drilling of a well already 2,000 feet deep than that which he acquired on the day of the accident. He had been in defendant's employ but a few days, and, according to Hart's testimony, had been otherwise occupied until the morning of that day. It is said

the tongs had slipped several times during the day, but that no one had been hurt, and we find no reason to believe that Porter was warned, in that way or in any other. that he was likely to be killed. In fact we doubt whether that possibility had occurred to the defendant or any of its officers. But, the difference between defendant and Porter was that defendant was bound to have foreseen such a possibility or probability whilst Porter was entitled to do the work to which he was assigned, with the assurance that defendant would understand its own business and would protect him from perils which were not obvious and of which he had not been sufficiently warned, either by it or by his own experience.

Clairain v. Telegraph Co., 40 La. Ann. 178, 3 South. 625; Daly v. Kiel, 106 La. 170, 30 South. 254; Carter v. Dubach Lumber Co., 113 La. 239, 36 South. 952; Smith v. Rock Island, A. & L. R. Co., 119 La. 537, 44 South. 290; Underwood v. Gulf Refining Co., 128 La. 968, 55 South. 641.

It is said that the evidence does not show conclusively that the decedent died of the injury that he received, but neither of the physicians who saw him were able to say that he did not, and we are satisfied that he did. We do not agree with the doctor, who saw him during the last hour of his life, that having received a blow which broke three of his ribs, his passing blood from his bowels should, or could, reasonably be attributed to a purgative that had been administered to him, rather than to the effect of the blow. He was 29 years of age, was earning $3 a day, and left a widow, and, the petitioner alleges, one child, which is said to have been a year old, but we find in the record no evidence or admission on that subject. In Strickland v. L. R. & N. Co., 134 La. 238, 63 South. 888, the widow and minor children of a man 46 years of age earning from $50 to $60 per month, were allowed $12,000 for his death. In Lutenbacher v. Mitchell–Borne Construction Co., 136 La. 805, 67 South. 888, the childless widow of a man 49 years of age, earning $2.50 per day, was allowed $10,000.

We conclude that the plaintiff widow, should be allowed $10,000, with legal interest from the date at which this judgment shall become final, and that the claim in behalf of the minor should be dismissed as in case of nonsuit.

It is therefore ordered that the judgment appealed from be annulled, and that there now be judgment in favor of the plaintiff, Mrs. Bernice Porter, and against the defendant, the Rogers Oil & Gas Company, in the sum of $10,000, with legal interest thereon from the date upon which this judgment shall become final until paid, together with all costs. It is further ordered that the claim asserted by the tutrix in behalf of her minor child be dismissed as in case of nonsuit.