No. 2326
Second Circuit

---

MRS. JULIA S. HANSON v. THE TEXAS COMPANY, ET AL.

---

(October 21, 1925, Opinion and Decree)

---

(*Syllabus by the Editor*)

1. **Louisiana Digest—Appeal—Par. 628, 629.**
The verdict of the jury and judgment of the court in a suit for damages for personal injuries arising out of an automobile accident, causing injuries to a pedestrian, that the defendant was negligent in driving off the pavement where he hit the plaintiff, being manifestly correct, is affirmed.

2. **Louisiana Digest—Damages—Par. 105.**
The verdict of the jury and judgment of the court for $10,000 for injuries and

suffering and $743.00 for medical expenses to the plaintiff for permanent personal injuries, including a fracture of the skull about the base of the brain, being manifestly correct, is affirmed.

(Civil Code, Art. 2315. Editor's note.)

## ON APPLICATION FOR A REHEARING.

3. **Louisiana Digest—Appeal—Par. 628, 629.**

Where the circumstances surrounding an accident, together with the evidence of the witnesses, shows that the defendant was negligent, the verdict of the jury and judgment of the court to that effect must be affirmed.

4. **Louisiana Digest—Damages—Par. 105.**

$10,000 is correct quantum of damages where there was a permanent injury of the skull due to a fracture and some mental impairment which probably would grow worse.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo. Hon. J. H. Stephens, Judge.

This is a suit for personal injuries growing out of an automobile accident caused by the negligent driving of defendant's chauffeur.

There was judgment for plaintiff and defendant appealed.

Plaintiff answered the appeal asking that the amount of the award be increased.

Judgment affirmed.

Pugh & Boatner and J. N. Marcantel, of Shreveport, attorneys for plaintiff, appellee.

Wise, Randolph, Randall & Freyer, of Shreveport, attorneys for defendant, appellant.

ODOM, J. This is a suit against The Texas Company and Andrew Gourrier, an employee of said company, in which plaintiff, Mrs. Julia S. Hanson, seeks to recover damages for personal injuries which she received when an automobile driven by said Gourrier struck her.

The case was tried in the District Court before a jury. The plaintiff was awarded $10,000.00 for her injuries and suffering and $743.00 for expenses in the way of medical and hospital bills. The defendants have appealed. Plaintiff has answered the appeal, asking that the amount of the award be increased.

## OPINION

Only questions of fact are involved in this case.

It is admitted that the automobile driven by Andrew Gourrier, who was an employee of his co-defendant, The Texas Company, struck and injured plaintiff. Plaintiff charges negligence on the part of the driver of the car. Defendants in answer deny the charges of negligence and aver that the accident was caused solely on account of the carelessness of plaintiff in failing to heed the warnings given by the approaching car and in leaving the place of safety on the side of the road where she was walking and going upon the portion of the road reserved for vehicles.

Defendants, after denying negligence on their part, plead contributory negligence on the part of plaintiff.

The Shreveport-Texarkana highway has a pavement seventeen and one-half feet wide in the center. On each side of this pavement there is a strip of road about five feet wide which is graveled. On July 7, 1924, the plaintiff and her sister, Mrs. Cain, were traveling this road on foot going north. They were walking on the right-hand side of the road on the graveled strip. The two sisters were walking side by side, Mrs. Hanson, the plaintiff, being on the side next to the pavement, and her sister, Mrs. Cain, on the outside, next to the ditch.

The defendant, Gourrier, was in his automobile going north on the road, and as he overtook them the right-hand fender of his car struck the plaintiff, inflicting the injuries of which she complains.

As we understand the case, it is admitted by counsel on both sides that if the plaintiff was walking on the graveled portion of the road referred to by counsel as a "place of safety" and was struck by the automobile while on this place of safety, then the defendants are liable. On the contrary, if the driver of the automobile did not leave the paved portion of the road and if the plaintiff left her side of the road and got up on the paved portion thereof in front of the automobile so suddenly that it was impossible for the driver of the car to avoid the accident, then the defendants are not liable.

The whole case, therefore, hinges on the point whether the plaintiff was over on the graveled portion of the road when struck or whether she was on the paved part.

The testimony all shows that there was no reason or necessity for the driver of the car to leave the paved portion of the road nor was there any reason why the plaintiff should leave the graveled portion thereof and go over on the pavement.

The plaintiff contends that the driver of the car left the pavement and ran his car over on the graveled portion of the road where she was walking and struck her, and as there was no reason or necessity for him to do so he was grossly negligent and therefore liable.

On the contrary, defendants say that the driver of the car did not leave the pavement but that the plaintiff got on the paved portion of the road unexpectedly by him and that when he discovered her there he could not stop his car in time to avoid the collision.

The accident occurred about 8 o'clock P. M. on the evening of July 7, 1924. The witness says it was about "dusk dark". At any rate, it was dark enough to make it necessary for motorists to put on their lights.

All the testimony shows that the plaintiff and her sister were walking along the road on the right-hand side on the graveled part of the road usually used by pedestrians. Both plaintiff and her sister testify that they were walking close together engaged in conversation. Neither, it seems, was aware that an automobile was approaching them from the rear. The plaintiff says that she did not hear the car nor did she observe the lights; that the first knowledge she had of the presence of the car was when it struck and knocked her down. She is positive in her statement that at the time she was struck she was on the graveled portion of the road and that at no time did she go on the pavement until Gourrier's car struck her. Mrs. Cain, plaintiff's sister, says that plaintiff was walking by her side when the car struck her. She is positive that plaintiff did not leave the graveled portion of the road until struck by the car. She says, also, that the car ran very close to her, Mrs. Cain, so close that it "swished" her skirts around her ankles. She did not see the car hit her sister as the car approached them from the rear and they were both looking forward.

The defendant Gourrier's version of the accident is substantially as follows: He was driving north on the paved portion of the road at a moderate rate of speed, about fifteen miles an hour. He saw the plaintiff and her sister walking on the right-hand side of the road on the graveled portion. When he saw them they were about fifty feet ahead of him, and he says that he was looking at them from the moment he first saw them until his car struck plaintiff. He says that he was over on the right-hand side of the paved part of the road and moving in a straight

line and that if plaintiff had continued to walk along the gravel his car would have missed her about eighteen inches or two feet. He says that just as he overtook them the plaintiff either stumbled, stepped or fell over on the pavement in front of his car when it was so close to her that it was impossible for him to stop it in time to avoid the accident.

Aside from some conflicting statements, Gourrier's testimony is that his car at no time left the paved portion of the road and that plaintiff in some way left the place of safety where she was walking and got in front of his car on the pavement.

His testimony on the main point is corroborated by that of Mr. Golden and his wife and Mrs. Hughes, all three of whom were traveling in an automobile going south on the same road, meeting the other parties at the scene of the accident. Each of these witnesses says that plaintiff and her sister were walking on the side of the road on the gravel as the Gourrier car overtook them; that the Gourrier car was on the paved part of the road, and just at the moment that the car overtook them the plaintiff stepped, stumbled or fell over onto the paved part of the road immediately in front of the car. They each use about the same language in describing how she got onto the pavement. She either "stumbled or fell" or stepped onto the pavement.

We think it fair to state with reference to the testimony of these witnesses that they believe that plaintiff either "stumbled or fell" over onto the paved portion of the road. But our belief is, after a most careful reading and consideration of all the testimony, and considering the surroundings as detailed by all the witnesses, that their statement that plaintiff either "stumbled or fell" is only a conclusion which they have reached from the fact that they saw her walking over on the graveled por-

tion of the road just prior to the moment of the collision and that the Gourrier car was, at the time they first saw it, running on the pavement and that when Gourrier stopped his car after striking plaintiff the car was still on the pavement. When Mr. Gourrier stopped his car it was on the pavement and plaintiff was lying under the front axle. These witnesses have considered all these facts and have, we think, reached the conclusion that plaintiff either "stumbled or fell" in front of the car. That is the only way they can account for the fact that she got hit.

However, their testimony, taken as a whole and in connection with that of the other witnesses and with all the surroundings, leads us to belive that the conclusion is erroneous.

It must be borne in mind that both plaintiff and Mrs. Cain state that they were over on the side of the road walking side by side at the moment of the collision. They both state that at no time did plaintiff go on the pavement until she was struck by the car.

Mr. Gourrier and each of the other witnesses who testified on the point say that at the time the car struck plaintiff she was standing upright. She was not in a leaning or falling position. It seems reasonable to us to conclude that if she either stumbled or fell her body would have been leaning towards the road instead of being upright at the time she was struck.

Again, Mr. Gourrier says that he saw plaintiff when he was fifty feet behind her and watched her until the very moment of the accident. According to his testimony he was in a position to see every movement she made. He was asked, page 53 of the testimony:

"Q. What did they do before the accident?

"A. Before the accident? Walked straight ahead.

"Q. At the moment of the accident what happened?

"A. As near as I can tell, just like this: As I came out Mrs. Hanson either stepped or fell, or something, in front of me, just as I came there she came in front of me some way or other; I never could see how she got in front like that; she either stepped or fell."

If plaintiff made any sudden movement towards the road, Gourrier was in a position to know what that movement was. She either stepped or fell, he says. Being so close to her, with his lights on, if he was watching her as he should have been doing and as he says he was, he should know whether she stepped over onto the road or whether she stumbled and fell.

Plaintiff and Mrs. Cain both say that she did neither.

In view of the fact that Gourrier's testimony on this point is corroborated by that of the other witnesses who saw that plaintiff either stumbled or fell onto the road, we might be in some doubt on the point if it were not for the fact that the surroundings at the moment of and just before the collision were such as to make it impossible for them to know precisely what happened.

As stated, Gourrier was traveling north on the road, the direction in which plaintiff was walking. At some distance north of the scene and in front of him, the distance being variously estimated at between 200 and 500 yards, Mr. Golden came onto the highway in his car from a side road. On reaching the main road he turned south and met Gourrier at or within a few feet of where the accident happened. Gourrier says that the Golden car was only 30 or 35 feet in front of him when his car struck plaintiff. All the testimony shows that when the Gourrier car and the Golden car

were stopped they were practically opposite each other on the road. The lights on the Golden car were on and there is no testimony that they were dimmed. After the Golden car came into the main road another car approached it from the rear and ran at a rapid rate around it and passed it. This other car, in order to pass the Golden car, ran over on the left-hand side of the road going south—the same side of the road on which Gourrier's car was running. After passing the Golden car the other car swerved back to the right-hand side of the road and met Gourrier's car just before the moment of the accident. Therefore, just a moment before and at the time his car struck plaintiff Gourrier had the glare of these headlights in his face which, according to common experience, was sufficient to practically blind him. The witnesses say that this other car had passed on, but just how far none of them stated; but if it be said that this car was out of the way, it is probable that the glare of its lights had affected Gourrier's vision to some extent at least. Then as soon as he had passed it he was confronted with the lights of the Golden car in the road only a few feet in front of him.

Gourrier had, of course, observed the car which had just passed his and which had run around the Golden car and he, of course, saw the Golden car coming. We do not think under these conditions Gourrier could see very clearly. Furthermore, seeing this other car getting over on his side of the road in order to pass the Golden car, and having to meet it and the Golden car, naturally caused Gourrier to swerve over to the right in order to avoid a collision with these cars.

This paved part of the road is only seventeen and one-half feet wide, which allows none too much margin between cars

meeting. Gourrier, of course, took no chance on a collision with either of them, and in order to be safe we have no doubt he centered his attention very largely on them and gave them a wide margin. Having his attention centered to some extent at least on the passing cars to his left, and being necessarily blinded somewhat by the bright headlights, he was not in a position to watch plaintiff all the time, as he says he did, and therefore was not in a position to see and to watch her movements.

His testimony, therefore, that plaintiff stepped or fell onto the road in front of his car, in view of these surroundings and in view of the fact that he cannot say whether she stepped or fell, is greatly weakened, if not destroyed.

The graveled portion of this road where plaintiff was walking is practically, if not quite, on a level with the pavement. We are not informed as to whether the line of demarcation between the edge of the pavement and the gravel is very clear. In view of all the conditions we doubt if either Gourrier or those in the Golden car were in a position to know whether Gourrier's car got off the pavement or not.

There is nothing in the testimony to show that there was any obstruction on the graveled portion of the road where plaintiff was walking or any depression therein which would cause her to stumble or fall, and there is no suggestion that she had any reason for leaving that portion of the road which she had selected on which to walk and get on the paved portion thereof, and it would seem strange that having selected this portion of the road as a place of safety she would leave it and take a position on the paved portion of the road while an automobile was meeting her and only a few feet in front.

There is some conflict in the testimony given by those witnesses in the Golden car. The only point on which they all agree is that plaintiff either stumbled or fell on the pavement. Mr. Golden, for instance, says that the other car going south did not pass his car but was in front of him when he got onto the main highway. His wife and Mrs. Hughes, who were in the back seat, both say that this other car overtook them and passed them. Again, Mrs. Hughes says that Mr. and Mrs. Golden were talking and laughing just before the accident and that Mrs. Golden was "kidding" her husband about something and that she was listening and laughing. However, neither Mr. or Mrs. Golden recall that Mrs. Golden says that she remarked to the others in the car that the plaintiff was walking dangerously near the edge of the pavement. Neither Mr. Golden nor Mrs. Hughes remember this remark, and on cross-examination Mrs. Golden finally admitted that she probably "thought that to herself" and did not make the remark. We are thus caused to wonder why they are all together on the vital point at issue and are apart on other details.

The testimony convinces us that the plaintiff was walking on the gravel when she was struck by the defendant's car and that she did not get on this pavement until after the collision, and that the accident was caused solely on account of the negligence of the driver of the car in swerving too far to the right.

Our conclusion on this point is strengthened by the undisputed fact that his car ran very close to Mrs. Cain, who was walking on the outside near the ditch. Plaintiff and Mrs. Cain say they were walking side by side, close together. Other witnesses say that there was a space of two or three feet between them. There is no suggestion that Mrs. Cain made any move toward

the road and yet the car ran so close to her that her skirts "swished" around her ankles. Mrs. Cane must have been walking at least four feet from the edge of the pavement, according to all the testimony. Gourrier's car must therefore have left the pavement in order to run so close to her.

As already stated, it is conceded that if Gourrier left the pavement and went over on the gravel where plaintiff was walking and struck her there, he was grossly negligent and that he and The Texas Company, by whom he was employed at the time, are liable.

The most favorable aspect of the case from the standpoint of defendants is that the testimony is conflicting on the vital point, the plaintiff and her sister swearing to one state of facts and the defendants' witnesses to another.

The case was tried before a jury. The jurors saw the witnesses and heard them testify and were in better position, of course, to pass upon their credibility than we are. Their unanimous verdict was in favor of the plaintiff, and we think they made no error. Even if we were in some doubt, we should give great weight to the jury's verdict, based as it was on questions of fact and on conflicting testimony. Especially in view of the fact that the defendants made no motion for a new trial and this court, therefore, has not the benefit of the views of the trial judge.

See:

Mequet, et al., vs. Algiers Mfg. Co., 147 La. 364, 84 South. 904.

Masicot vs. N. O. Ry. & Light Co., 141 La. 622, 75 South. 490.

Strickland vs. La. Ry. & Nav. Co., 134 La. 238, 63 South. 888.

Bofill vs. N. O. Ry. & Light Co., 135 La. 995, 66 South. 339.

## ON THE QUANTUM OF DAMAGES

Plaintiff was knocked down and thrown under the automobile and was seriously injured and permanently disabled. She was carried to a sanitarium on July 7 and remained there until July 30, when she was removed. She was returned to the sanitarium on August 28 and remained there until September 17, being in the sanitarium in all about seven weeks. She was bruised about the body, her skull was badly fractured, she had hemorrhages from the brain, one of her eyes is permanently injured, she had a contusion or bruise over the right eye and right temple, she was unconscious for several hours and had bruises and abrasions on other parts of the body.

Dr. J. D. Young, whose practice is limited to mental and nervous diseases, attended the plaintiff shortly after she was carried to the sanitarium on July 7, and he described her condition as follows:

"At the time I examined Mrs. Hanson she was unconscious, in a state of coma. She had marked abrasions over the right shoulder and on the right leg. Both eyes were completely closed. She had marked rigidity of the neck, complete loss of all reflexes. The right eye was closed. The pupil of the eye on the right side was marked dilated. The right eye was unable to move in any direction at all at that time. She had paralysis of the left side of the face. The X-ray showed a fracture of the right parital, right skull, extending through the base, and due to the fact that there was no depression of the bone and the symptoms indicated marked intra-cranial pressure, that is pressure within the skull, a spinal puncture was done, and the spinal fluid found and the increased pressure was around thirty milometers, normal twelve, which showed that she had a large hemorrhage into the meninges of the brain, that could drain by the spinal puncture."

Dr. Young says that he has treated her

since that. He says, on page 78 of the testimony:

"There was a marked hemorrhage of the meninges, the covering of the brain. Several hemorrhages directly into the brain."

Further describing the injury to the skull, he stated that the fracture extended from the right parital region down to the base. He was asked if the conditions found by him were such as are likely to cause paralysis in any part of the body, and he said:

"Depending upon where the hemorrhages are. We have certain paralysis in Mrs. Hanson's case. There has been hemorrhage into the mucuos that serves the mid-brain, involving the three meninges on the right side. She also had a hemorrhage into the pois, lower down, involving the right part of the face, causing paralysis or paresis of those nerves."

He was then asked:

"Are the conditions you found likely to cause nervousness, irritability and a condition of dizziness?"

And he answered:

"Mrs. Hanson, today, is suffering from the standpoint of nervous diseases, with what is called a mild type of *argo dementia.* That is to say, she has not the full mental capacity of doing tne things that she did before."

He says that she has marked irritability, manifested by inco-ordination, and that she is unable to do certain mental things that she did before, and that she has marked dizziness, especially with the eyes closed, head thrown back, having a tendency to fall backward. Being asked what he had to say with respect to the permanency of Mrs. Hanson's condition, and her infirmities, he said:

"The conditions found of lesions of the central nervous system reach their maxi-

mum improvement at the end of three months, and I am bound to think that they are permanent."

He says that Mrs. Hanson is able to do a small amount of work in which there is no risk, such as sweeping and things of that type, but that for a patient suffering with the condition that Mrs. Hanson is in at this time it is dangerous for her to do any work like that around a cook stove or hot water.

Dr. R. C. Young, an eye specialist, testified that when he first saw the plaintiff she had a marked contusion of the right eye, a marked swelling, "a condition of adenia of the retina of the eye, paralysis of five of the muscles of that eye, all of them except one paralysis or stricture of the pupil".

He says that she has double vision in the right eye and says that her condition is permanent and that she will never be able, in his opinion, to use both eyes at the same time.

Dr. J. C. Willis testified that he attended and examined the patient and that she had a fracture of the right temporal bone that extended to the base. He says that in addition to his own staff he called in Dr. J. D. Young and Dr. Carl Young. He was asked to state his opinion as to the results of the injuries which the plaintiff received, especially in regard to the impairment of her general physical condition, earning capacity and the like, and he stated:

"That varies quite a good deal, could not say in any particular case, of course, temporarily there is total disability to do anything. Of course, it depends largely on the amount of hemorrhage that occurs at the base of the brain as to how much temporal disability there is, but as to the ultimate result, that is uncertain."

He further testified that there were hemorrhages of the brain, and he was

asked if in his opinion a person who has suffered fracture of the skull about the base of the brain ever fully recovered, and he said:

"I doubt it."

Under this testimony of the experts we think the jury was warranted in fixing the amount of damages at $10,000.00.

Mrs. Hanson is a young woman, only 32 years of age. She is permanently disabled.

Plaintiff has asked an increase of the amount awarded by the jury. We do not feel disposed to disturb the verdict as rendered.

There seems to be no dispute over the amount allowed for expenses incurred by plaintiff on account of the accident in the way of medical and hospital bills.

For the reasons assigned it is ordered, adjudged and decreed that the verdict of the jury and the judgment of the lower court based thereon be affirmed with costs.

----

ON APPLICATION FOR REHEARING

CARVER, J.  In an able brief filed in support of their application for a rehearing defendants' counsel quote from McGinn vs. N. O. Ry. & L. Co., 118 La. 811, 43 South. 450.

"Were we to sustain the verdict of the jury and the judgment of the court, we would have to ascribe fault to the defendant arbitrarily without any proof, and even really without any suggestion."

And counsel say that much is the case here.

In the McGinn case a woman passenger on a street car alleged as her cause of action that after the car came to a full stop and while she was rising from her seat to leave the car the conductor gave the motorneer the signal to go ahead, whereupon the motorneer applied the power

to the car which then went forward with great force, throwing plaintiff violently down in the car.

No testimony was introduced to support these allegations. On the contrary, as a witness the plaintiff gave an uncertain, confused and somewhat contradictory account of the accident, saying that the car after stopping did not move either forward or backward but, on the contrary, claiming that something rose up under her. Her son testified that he neither saw nor heard any signal to go ahead but that the car, after stopping, moved forward about half an inch, saying at one time that he saw but did not hear the jolt and at another that he heard it. He inferred that the motorneer must have applied the power.

The conductor and motorneer both testified that after the car stopped no signal to go ahead was given and the car did not go ahead.

The motorneer further testified that it was not possible for the car to move only half an inch under any way he had of feeding the power.

Pfeifer, a passenger, gave testimony so different from that of all the other witnesses that no notice seems to have been taken of it.

Mueller, the only other passenger, was positive that after stopping the car made no move either forward or backward.

In the Supreme Court plaintiffs' counsel evidently recognizing his utter failure to prove the negligence alleged, or any other, seems not to have relied on any claim of proven negligence but asked for a judgment on the legal proposition that the contract between a passenger and a carrier for hire being one for safe passage, in case of injury a presumption of negligence arose which the carrier was obliged to rebut.  The court said:

"The particular cause assigned by the plaintiff for the accident after the car had come to a full stop at her place of destination was that the conductor in charge of the car gave the motorman the signal to go ahead, upon which signal the latter applied the power to the car, which went forward with great force, throwing her down violently and breaking her leg. This has been disproved. We are satisfied that the car did come to a full stop as she alleges it did, but we are also satisfied that the conductor gave no signal to go ahead, and that the latter did not, in fact, do so. We fail to find any fact disclosed by the evidence which would warrant or justify us even in inferring that either of those employees had been guilty of negligence or failure of duty in any particular. The plaintiff does not pretend that the appliances of the car were not such as they should have been, nor does she intimate that the track was out of order. * * *"

And then added the quotation copied above on which defendant's counsel rely herein.

We cannot agree with counsel that this is a proper case in which to pursue the course taken by the Supreme Court in the McGinn case.

The testimony of plaintiff and her sister, if true, is full proof of negligence on the part of defendant, and we do not find the contrary evidence, such as to warrant us in saying it is not, when the jury evidently believed it.

As to the testimony of the defendant's witnesses, we deem it unnecessary to add anything to what was said in our original opinion concerning the glaring car lights and other things which easily could have interfered with their ability to make accurate observation of the occurrence.

The physical facts do not seem to us such as to require the inference drawn by defendant's counsel.

If Gourrier turned to the right, getting off the pavement, and then just as or just after striking plaintiff turned to the left, getting back on the pavement, this, we think, might reasonably account for the location of plaintiff's wounds and for her position and that of the car when it stopped.

The oncoming of what is called the "unknown car"—swerved to or towards Gourrier's side of the road as it had to do to pass the Golden car—is a fact quite persuasive towards the conclusion that he did turn toward the right. If he did, and left the pavement, then he surely did make the left-hand turn, because when he stopped he was back on the pavement.

Premising that plaintiff and her sister were walking shoulder to shoulder at the very moment of the accident; that plaintiff was first struck on the left leg; that the inside point of the fender, which is evidently what first struck plaintiff, is 18 inches from the outside point, counsel argue that the account given by plaintiff and her sister cannot be true, because if so the sister would have been struck, which she was not.

None of these circumstances are proven and one at least is not true.

Plaintiff and her sister say they were walking side by side, but this does not necessarily mean side to side. If a foot or two apart, they might reasonably speak of this as side by side.

The width of a Ford fender at its front end and for a few inches back is not 18 inches wide but only about 8 inches.

The plaintiff was dragged about 10 or 11 feet and various parts of her body were struck. It is guesswork to say which part of her body was struck first.

Defendant's counsel complain that the damages allowed by the jury, $10,000.00, are excessive, and cite many cases where lower awards were made.

In our opinion most of these cases are not comparable to this one and in none of them were the injuries so serious.

Our original opinion fully states the extent of plaintiff's injuries, amongst which were fracture of the skull, serious and permanent impairment of vision and nerves, some injury to mentality and practically total destruction of earning power.

Amongst the cases cited by defendant's counsel are four, in each of which $7500.00 was allowed. These are:

Miley vs. Saw Mill Co., 141 La. 484, 75 South. 214.

Knight vs. V. S. & P. Ry. Co., 142 La 357, 76 South. 799.

Dingle vs. Railway Co., 142 La. 717, 77 South. 513.

Clemmons vs. T. & P. Ry. Co., 148 La. 1050, 88 South. 394.

In the Clemmons case the only injury was the loss of a leg.

In the Dingle case the injuries were dislocation of right knee, splitting of one of the bones of the right leg, which the surgeons thought would necessitate her always walking with crutches, or a crutch and cane, and an injury, not described, but said to be serious, to her right arm, permanently impairing it to some extent. The court found that plaintiff was under no necessity of earning her own living, having devoted daughters who cared for her wants, and this consideration seems to have been an element in fixing the damages as low as was done.

In the Miley case the only injury was to a leg, though it was very serious, crippling Miley for life, but he could probably have his condition improved by having it amputated.

In none of these cases was there any injury to nerves, eye or mind, which, in our opinion, are three of the most serious injuries which one could suffer.

In the Knight case there was no fracture of the skull and no injury to either eye. There was some mental impairment, though not very much; there was a possibility and perhaps a probability that this would grow worse.

Comparing the injuries in this case to those in the four above mentioned, we cannot say the jury erred in fixing the damages at $10,000.00.

Rehearing refused.